## Appeal of AMERICAN EXPRESS CO.

Docket No. 550.   Submitted March 9, 1925.   Decided September 8, 1925.

> March 1, 1913, values of lands and buildings established by the testimony of expert witnesses.
>
> An amount accrued and set up on the books of a corporation computed on the basis of a percentage of the regular pay roll during a taxable period for the purpose of being disbursed at or near the end of that period for additional compensation of employees is an allowable deduction for the period, although the payments of small parts of the funds so accrued are not recorded until the following year.

*Heber Smith, Esq.,* and *Sidney W. Davidson, Esq.,* for the taxpayer.

*A. Calder Mackay, Esq.,* for the Commissioner.

Before James, Sternhagen, Trammell, and Trussell.

This is an appeal from the determination of a deficiency in income and profits tax for the years 1919 and 1920, in the amounts of $21.775.59 and $34,799.70, respectively, aggregating $56,575.29, predicated upon the disallowance of an amount accrued upon the taxpayer's books for the purpose of meeting additional compensation of employees, and a difference between the taxpayer and the Commissioner regarding the amount of gain derived from the sale of property which had been acquired long prior to March 1, 1913.

### FINDINGS OF FACT.

The American Express Co. is an unincorporated association consisting of more than seven members and having its principal office at No. 65 Broadway, in the Borough of Manhattan, City of New York.

On March 1, 1913, and for many years prior thereto, the American Express Co. was the owner of a certain parcel of land with the building standing thereon, known as " 23–29 West Monroe Street," Chicago, Ill., said premises being more particularly described as follows:

> The east 24.275 feet of lot 2 and the west 65.8 feet of lot 3, in block 141, school section addition to Chicago, having a north front on West Monroe Street 130 feet west of South State Street of 90.275 feet, with a uniform depth of 190 feet to a public alley 18 feet wide. There is a private alley east of and adjoining the said premises 10 feet in width.

Said premises are and were on March 1, 1913, improved with a brick and stone building seven stories in height, formerly occupied by the American Express Co. as its general offices and for offices and assembly halls. In the year 1920 the American Express Co.

sold said parcel of land with the buildings thereon for the sum of $1,400,000 After deducting brokers' commissions and other expenses of the sale, the net selling price received by the company was $1,340,894.73.

On or about November 4, 1924, the regularly constituted valuation committee of the Chicago Real Estate Board, upon an application from the taxpayer, made a retrospective appraisal of the land and building as of the date of March 1, 1913, and certified the results of such appraisal in the usual form employed by said committee, setting forth its findings as follows:

| | |
|---|---|
| Land is worth, exclusive of improvements | $1,029,120 |
| Value of improvements | 125,000 |
| Total value | 1,154,120 |

The taxpayer's property located on the south side of Monroe Street is 90.275 feet by 190 feet, or 17,152.25 square feet. It has an 18-foot public alley in the rear and a 10-foot private alley on the east side and is approximately 110 feet from the corner of State Street. The valuation placed upon the land by the committee of the Chicago Real Estate Board is approximately $60 per square foot.

Testimony of witnesses examined concerning transactions affecting other comparable properties establish these facts: The property known as the Harris Trust & Savings Bank property on the same side of Monroe Street, west of Clark, and approximately 912 feet from the corner of State Street, was sold in the year 1909 on the basis of $53.28 per square foot.

In 1911 a Monroe Street tract between Dearborn and Clark with a frontage of 23½ feet and a depth of 190 feet was leased for 99 years on the basis of a 4 per cent return on a valuation of $56.40 per square foot. Another tract with a frontage of 45¼ feet, 190 feet deep, was leased for 99 years on the basis of a 4 per cent return on a valuation of $56.47 per square foot.

The Commissioner in computing the alleged gain derived by the taxpayer from the sale of property used as the March 1, 1913, value substantially the figures found upon the local tax records of the City of Chicago, which were—

| | |
|---|---|
| Value of land | $678,951 |
| Value of building | 150,000 |
| Total | 828,951 |

The taxpayer computed its gain from the sale of this property to be $156,320.32. The Commissioner computed the alleged gain from the sale of this property to be $577,265.57.

The books of the American Express Co. in 1920 were, and for many years prior thereto had been, regularly kept on an accrual basis and its income-tax returns were made on the same basis.

On November 17, 1919, the board of directors of the American Express Co. adopted the following resolution:

*Resolved,* That the president be, and he is hereby, authorized to make payments to all employees of this company in an amount that seems to him to be equitable as additional salary for services rendered during the year, the total amount to be expended by him in carrying this out not to exceed 20 per cent of the company's total pay roll for the calendar year 1919.

Pursuant to that resolution a reserve sufficient to meet the payment of an amount equal to 20 per cent of the total pay roll of the company for 1919 was then created on the company's books, and disbursements were made from that reserve near the close of the year. On January 1, 1920, there remained in that reserve for additional compensation the sum of $181,363.45, which was disbursed for the same purposes set forth in said resolution during the year 1920.

On May 12, 1920, the board of directors of the American Express Co. adopted the following resolution:

*Resolved,* That the president be, and he is hereby, authorized to make payments to all employees of this company in an amount that seems to him to be equitable as additional compensation for services rendered during the period January 1, 1920, to June 30, 1920, the total amount to be expended by him in carrying this out not to exceed 22 per cent of the company's pay roll for the period above mentioned.

On November 10, 1920, said board of directors adopted the following resolution:

*Resolved,* That the president be, and he is hereby, authorized to make payments to all employees of this company in an amount that seems to him to be equitable as additional compensation for services rendered during the period July 1, 1920, to December 31, 1920, the total amount to be expended by him in carrying this out not to exceed 22 per cent of the company's pay roll for the period above mentioned.

Pursuant to the resolutions above set forth the American Express Co. set up on its books a reserve for additional compensation for the year 1920, the total amount of which was 22 per cent of its total pay roll for that year, and as payments of the additional compensation provided by said resolutions were made, the amounts so paid were charged against that reserve.

Of the amount accrued upon the books of the company to meet its additional compensation of employees for the year 1920, all of such accrual except $37,807.36 was recorded upon the books of the company at its main office as disbursed during the year 1920, and of the said amount which was not so recorded as disbursed during 1920 the amount of $23,697.46 was actually disbursed on or before De-

cember 31, 1920, at the sub-offices of the taxpayer in London, Buenos Aires, and Shanghai, and all of the remainder was disbursed for the same purposes during the early part of 1921.

The Board has determined that the fair market value of the properties here under consideration were on March 1, 1913, as follows:

Land _____ $1, 029, 120
Building _____ 125, 000

### DECISION.

The liability of this taxpayer to income and profits taxes for the years 1919 and 1920 should be computed in accordance with the following opinion. The final deficiencies in tax, if any, will be settled either upon consent or on 15 days' notice, pursuant to Rule 50.

### OPINION.

TRUSSELL: In the year 1920 the taxpayer sold property consisting of land and building in the City of Chicago which it had acquired many years prior to 1913 and had occupied as its Chicago office. The amount realized from this sale was $1,340,894.73. From this transaction the taxpayer reported in its return for the year 1920 a taxable gain of $156,320.32, computing this latter amount as the difference between the net amount realized from the sale and the fair market value of the property as of March 1, 1913. The Commissioner rejected the taxpayer's computation of gain, and, basing his action upon the 1913 valuation of this property as found upon the records of the local assessors of the City of Chicago, computed the taxable gain at $577,265.57. Thereupon, the taxpayer procured from the valuation committee of the Chicago Real Estate Board a retrospective appraisal of said property, and in support of its appeal has presented such an appraisal, together with the testimony of two of the men who took part in making such appraisal and three other well known and recognized experts in the real estate business in Chicago.

The testimony of two of the members of the valuation committee of the Real Estate Board shows that in the performance of their duty as appraisers all members of the committee visited and examined the property in question; they viewed it from the standpoint of its location and its availability for business purposes, not only with reference to its then uses but also with reference to its possible uses in the development of business in the immediate neighborhood of its location. They further examined the records of transactions of sales and leases of other properties on the same street, and on adjoining streets, and testified as to the values at which other prop-

erties near to the property of the taxpayer had been sold or leased, comparing the data so obtained with the possibilities of the taxpayer's property.

The valuation placed upon the taxpayer's property by the committee of the Real Estate Board, and the testimony of the three other experts, all unite in establishing a value of approximately $60 per square foot for the taxpayer's property.

Section 202(a) of the Revenue Act of 1918 provides that "in the case of property acquired before March 1, 1913, the fair market price or value of such property as of that date" shall be the basis for ascertaining the gain or loss sustained from the sale of such property. "The market value of property is the price which it will bring when offered for sale by one who desires, but is not obliged, to sell it, and is purchased by one who is under no necessity of having it." *In re Block Bounded by Avenue A, etc.*, 122 N. Y. S. 321. There having been no actual transaction affecting the taxpayer's property for many years prior to its sale in 1920, its value in 1913 can be established only by comparison with other transactions in its near neighborhood, and by the opinions of witnesses, who, by virtue of their experience and information as to real estate values and transactions, are qualified to testify concerning its then value. The record of this appeal shows that the members of the Chicago Real Estate Board valuation committee who made the appraisal in the instant case were selected by the board as its standing committee for the valuation of property in the Loop district of Chicago, within which the property was situated. Each of the three other witnesses testifying on behalf of the taxpayer had had long and successful experience in the real estate business and especially in the business as related to the central business district of the city. It thus appears that each and all of the members of the Real Estate Board's valuation committee, and all of the other witnesses called, were especially qualified to give expert opinions as to the value of the property and that such opinions are deserving of the highest consideration.

"Opinions of witnesses as to the value of land, houses, etc., have been very generally received when the witnesses by experience and information are qualified to speak." *Wyatt v. Seaboard Air Line Railway*, 156 N. C. 307, 72 S. E. 383. "Anyone having knowledge of the fact is competent to testify to the value of the property." *City of Chicago v. Lehmann*, 262 Ill. 468, 104 N. E. 829. Market value of a vessel destroyed by collision "may be determined from the opinions and estimates of competent witnesses who are qualified by their experience and knowledge of the vessel to testify as to such value." *The Mobila*, 147 Fed. 882.

Respecting the value adopted by the Commissioner as taken from the local tax records of Chicago, each of the five witnesses testifying on behalf of the taxpayer was cross examined by counsel for the Commissioner, and each and all of them, in response to questions, testified that they did not give serious consideration to the assessor's valuations and that such valuations were not regarded by real estate owners and dealers in Chicago as having any near relation to the market value of properties.

In respect of the assessor's valuations the taxpayer furnished a photostat copy of a page of the assessment records of the City of Chicago covering the years 1911 to 1914, inclusive. Upon this page appears the description of the taxpayer's properties and the valuations used by the Commissioner appear from this evidence to have been upon the assessor's record books for the year 1911 and to have continued through the years 1912, 1913, and 1914 without change. The record does not show whether the assessor's valuations actually originated in the year 1911, and we are thus left uninformed as to when these valuations were first used or how long they may have been on the assessor's books.

In a situation like the one here under consideration the market value of a piece or parcel of property must be determined on the basis of the opinions and estimates of men qualified by knowledge and experience to testify concerning such value. The record in this appeal detailing the testimony of experienced realtors who have long been engaged in buying, selling, and dealing in lands and buildings in the City of Chicago and in the immediate neighborhood of the taxpayer's property, and who are personally familiar with the particular property in question, and whose business it has been for years to study values of the present and the past, convinces us that the estimate of values placed upon taxpayer's property by the valuation committee of the Chicago Real Estate Board is indicative of, and for the purposes of this appeal must be taken to establish, the true fair market value of the taxpayer's property as of March 1, 1913.

This taxpayer is an association subject to the provisions of the Income and Profits Tax Act of 1918 as applicable to corporations and is entitled to all the deductions provided for in section 234 (a) (1) of said Act, which reads in part as follows:

All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered, * * *.

The words " paid or incurred " as used in this section were defined in section 200 of the same Act as follows:

The term "paid," for the purposes of the deductions and credits under this title, means "paid or accrued" or "paid or incurred," and the terms "paid or incurred" and "paid or accrued" shall be construed according to the method of accounting upon the basis of which the net income is computed under section 212.

Section 212 (b) provides that the net income of taxpayers shall be computed "in accordance with the method of accounting regularly employed in keeping the books of such taxpayer," provided that such accounting methods clearly reflect the income.

It has not been contended in this appeal that all of the two amounts disbursed by the taxpayer as additional compensation for its employees for the calendar years 1919 and 1920 were not lawful deductions from gross income. The question here raised is whether such amounts may be deducted in the year in which the total amount was accrued and set up on the books of the taxpayer or whether such parts of such amounts as were not known to the New York office to have been assigned or paid to specific employees must be deducted in the year when actually so assigned or disbursed.

All additional compensation provided for by this taxpayer as set forth in the findings of fact was for and in respect to the business of the taxpayer in the years 1919 and 1920, respectively, and the theory and the purpose of accrual accounting is to apportion to each accounting period such parts of continuing expenses as are properly chargeable against the business of each respective period.

In the year 1919 this taxpayer, by proper authority of its organization, provided for and agreed to pay to its employees additional compensation not in excess of 20 per cent of the total of the regular pay roll, such payments to be compensation for services during the year 1919. The amount required to meet this obligation was set up on the books of the company as an accrued expense during that year and nearly all of it was disbursed prior to December 31. A similar course of action was taken by the taxpayer during and for the year 1920.

We are of the opinion that the entire amount accrued and set up on the books of this taxpayer for the year 1919, and likewise for the year 1920, as additional compensation for its employees during each of those years, was a proper and lawful deduction from gross income for the year in which the amounts were set up and accrued on the books of the company and that the tax liability of this taxpayer for each of said years should be recomputed after the allowance of the deduction of the amounts accrued for additional compensation of employees as originally set up and accrued upon the taxpayer's books of account.

ARUNDELL not participating.